CHARLES W. WALES, An Infant, etc., Appellant, *v.* RICHARD STOUT *et al.*, Impleaded, etc., Respondents.

*Court of Appeals, June 11, 1889.*

Reversing 41 Hun, 644, Mem.

1. *Contracts. Statutes of frauds.*—Where there was no existing debt or obligation until it was created by the contract, and the consideration moved directly from the plaintiff to the defendants, and consisted in the waiver of his legal right to an accounting, his consent to the continuance of business and employment of the estate property for the benefit of defendants, and the removal of an obstacle to the appropriation by them of such property to their claims against the estate, it is a valuable and sufficient consideration within the authorities, and constitutes the undertaking of the defendants an original promise.

2. *Same.*—A contract construed by the court to be an absolute and unconditional undertaking by the defendants to execute their bonds, etc.

*Lewis E. Carr*, for appellant.

*L. Laflin Kellogg*, for respondents.

RUGER, Ch. J.—The plaintiff sought by this action to compel the defendants, Richard Stout and George H. Stout, as survivors of the firm of W. & R. Stout & Brother, to execute their bond in the sum of $4,000 to the executors of the estate of Gideon Wales, conditioned to pay that sum, and the interest thereon, in accordance with the terms of a legacy contained in the will of Gideon Wales, deceased, for the benefit of Henry Wales and his son, the plaintiff, and in default of the execution of such bond, to require the payment by them of such sum to the executors to be invested in accordance with the provisions of such legacy.

The action, as stated in the amended complaint, was based upon an alleged contract made December 13, 1879, between the plaintiff and W. & R. Stout & Brother, whereby the latter covenanted to execute such bond in consideration of the settlement of certain actions then pending in the supreme court between Charles Wales and Henry Wales, plaintiffs, and the executors of Gideon Wales, deceased, defendants. So far as the questions in dispute are concerned, the answer alleged that the only contract made by the defendants Stout, in relation to the subject of the action, was an agreement to act as trustees of the sum of $4,000 if the parties to said actions desired them to do so, and that the executors should also satisfactorily adjust the claims of W. & R. Stout & Brother against the estate of Gideon Wales; and alleged that such sum had not been delivered to them, or such adjustment had not been made, and therefore the condition upon which the bond was to be executed had not been complied with.

Upon a trial before the referee, he found that the contract was made, as alleged in the amended complaint; that the plaintiff had fully performed all of the conditions thereof required of him; and that the undertaking of the defendants, Stout, to execute such bond, was absolute and uncon-

ditional, and was made upon the consideration that Charles and Henry Wales should agree to the entry of a specified judgment in the actions referred to as pending between them, as plaintiffs, and the executors of Gideon Wales, as defendants ; and which stipulation he found had been made and judgment entered into in accordance therewith, and he, therefore, directed judgment in favor of the plaintiff, in compliance with the prayer of the complaint. The judgment entered on such report was, upon appeal, reversed by the general term on questions of fact. That court found that the contract was made by the Stouts upon the conditions that the sum specified should be invested with them by the executors or secured by mortgage to them.

The determination of the appeal requires us to review the facts of the case. We have carefully examined them and are of the opinion that the judgment of the general term was not warranted by the evidence.

The proof as to the terms of the contract was somewhat conflicting ; but a consideration of the situation, motives and interests of the respective parties, renders it quite improbable that the obligation of the Stouts depended upon a condition that the amount of the bond was first to be deposited with them by other parties or upon any other conditions except that performed by the plaintiff.

A brief history of the situation of the estate of Gideon Wales and the relation thereto of the several parties at the time of the making of the contract, will disclose the motives which influenced them respectively, and the objects which they severally had in view in its execution.

Previous to 1877, Gideon Wales had for many years carried on the business of a tanner at Pike's Pond, in Sullivan county, and was the owner of a tannery and much other property used in connection with his business. The defendants, W. & R. Stout & Brother, and their predecessors in business, had been for many years merchants in the city of New York, engaged in the hide and leather trade. For

a long period of time dealings in hides and leather had been carried on between Wales and the Stouts, which consisted principally of the purchase by the latter of raw hides, which were made into leather by Wales and then shipped to the Stouts for sale. They retained the ownership of the hides; charged Wales with the costs thereof; interest on their investments and commissions for their services; and credited him with the proceeds of such sales of leather as were made by them from time to time.

This course of business had, in 1877, resulted in a large indebtedness to them from Wales, which was entirely unsecured. In January, 1877, Wales died, having in his possession a large number of hides belonging to the Stouts, which were then in process of tanning, and owning a considerable amount of property. He left a will wherein he appointed his widow, Charlotte G. Wales, executrix, and his two sons, Reuben H. Wales and Blake G. Wales, executors, and provided that if, at the time of his death, he should be carrying on the business of tanning, at Pike Pond, his executors might continue the business as long as they wished, but that such business should be conducted in the name of the " Estate of Gideon Wales." It also provided that at the final settlement of his estate, the sum of $8,000, if his estate amounted to $80,000, and if not, then one-tenth part thereof, after settlement with his widow, should be invested in securities, and the income thereof devoted to the support of his son, Henry Wales, and wife, and their son, Charles Wales, with remainder in the principal sum to Charles Wales. Charlotte G. Wales, his widow Reuben H. Wales and Blake G. Wales, his sons, and Grace E. Wales, his daughter, were made residuary legatees.

The executors did not, after his death, conclude to carry on the tanning business in the name of .the " Estate of Gideon Wales," but, under the instructions and requirements of the Stouts, took possession of the property of the estate, converted it to their own use and formed a partner-

ship consisting of the residuary legatees, viz., the widow, Charlotte G. Wales, Reuben H. Wales, Blake G. Wales and Grace E. Wales, as individuals, to carry on the business of tanning leather upon, and with the property of, the estate.

After the death of Gideon Wales, and until the time of making the contract in question, the firm, formed by the legatees, carried on the business of tanning leather, using therein the property of the estate, and having dealings with the Stouts, receiving as such firm, from them, a large quantity of hides to tan, under arrangements similar to those formely existing during the lifetime of Gideon Wales. This course of business continued for upwards of two years, when, in the summer of 1879, the plaintiff and his father, Henry, becoming dissatisfied with the use made of the property of the estate by the executors, severally commenced actions in the supreme court against them to enforce an accounting as to the property of the estate, a determination of the amount of the one-tenth interest bequeathed to Henry Wales and his wife and son, and to require its investment according to the provisions of the will. Issue having been joined therein, the plaintiff proceeded to take evidence in respect thereto, and, among other things, examined the accounts of the Stout Brothers with the estate of Gideon Wales. These actions not only threatened a discontinuance of the business of tanning leather, established between the Stouts, and the new firm organized to carry on business with the property of the estate, but also the security of the Stouts for the payment of their claim against the estate of Gideon Wales.

The action of the Stouts in requiring the executors and residuary legatees of Gideon Wales, to take possession of his property and to devote it to the prosecution of their own business enterprises, seriously complicated the situation of the Stouts, and rendered it, at least, doubtful how far they could follow the property, and subject it to the

payment of their claim against the estate. In view of this situation, the Stouts required of the executors that these actions should be settled and the claims of Henry and Charles Wales adjusted, in order to avoid an accounting by the executors in respect to the estate, and the danger of the appointment of a receiver and the interruption of the business carried on by the legatees for the Stouts. To that end the Stouts, voluntarily and in their own interest, undertook to conduct the negotiations with the plaintiffs in those actions and solicited the attendance of the plaintiffs' attorneys at their office in New York, on December 13, 1879, for the purpose of arranging a settlement and discontinuance of such actions. In pursuance of their request, an interview was had on that day between the parties, at the store of the Stouts in New York, when the contract in question was made. During the entire negotiation the plaintiff's attorney occupied a room by himself, and had no personal communication with the executors. The negotiations, so far as he was concerned, were carried on wholly with the Stouts, and were finally terminated between them. They resulted in an agreement between the plaintiff and the Stouts, to the effect as found by the referee that the Stouts " in consideration of the waiver by the plaintiff, Charles W. Wales, of his right to an accounting * * * and of his acceptance of said sum of $4,000 as the one-tenth part of said estate, secured by a bond of said W. & R. Stout & Brother, and of the ending of the litigation at that point without further and additional expense * * * promised and agreed to execute their bond, conditioned as herein before found, as soon as the decree provided for in said settlement should be entered. The performance of such agreement on their part was dependent on no conditions to be performed by either of the parties to said actions, except the entry of the decree therein provided for, and furnishing the Stouts with a copy thereof." The referee further found that the said execu-

tors consented to the entry of the decree referred to " in reliance upon the agreement and promises of W. & R. Stout & Brother to secure that amount to the beneficiaries thereof by their said bond   *   *   *   and upon the further agreement of said firm to continue business dealings with them."

These findings are not only in accordance with the preponderance of direct evidence in the case, but are supported by every rational view which can be formed of the motives and objects of the parties in making such contract.

We think the general term misconceived the relation which the Stouts bore to the subject of the contract, and the estate of Gideon Wales. The executors of the estate had little or no interest in the result of the actions pending against them. It was the interest of the Stouts, and the security of their claim against the estate which was jeopardized by those actions. At this time the estate of Gideon Wales was confessedly insolvent, and the Stouts were substantially its only creditors. The estate of Gideon Wales was practically, therefore, W. & R. Stout & Brother; as the residuary legatees had no interest in it except through a possible surplus, arising upon its final liquidation. It was owing the Stout brothers an amount largely in excess of the value of its assets, and could continue business only with their permission and consent. If the Stouts refused to permit the executors to set apart any portion thereof to the payment of the plaintiff's legacy, they were powerless to do so ; and if the Stouts consented to do so, it diminished just so much the fund which they were entitled to have applied in reduction of their claim against the estate. In any event, a settlement of the actions in question, and an allowance of any sum to the plaintiffs therein, involved an appropriation of property which belonged to the creditors of the estate, and such property alone. It seems, therefore, quite absurd to suppose that the Stouts made it a condition of

giving the bond that they should be secured on what was practically their own property.

It is difficult to conceive any rational theory for the participation of the Stouts in the transaction upon the defendant's contention. If there was property of the estate capable of being set apart, mortgaged or otherwise pledged as security for the plaintiff's tenth interest, the executors could set it apart and retain it in their own hands as the appointed trustees under the will, to hold for the beneficiaries without the intervention of the Stouts.

The executors were to be the obligees of the bond which was to be given by the Stouts, and were to collect and hold it, as trustees for Henry and Charles Wales, and there was no office for other trustees to perform. The only explanation of the intervention of the Stouts in the transaction, is that as the practical owners of the property of the estate, they were to increase their advances to the estate, and become its debtors for the eventual payment of the stipulated legacy to the legatees, Henry and Charles Wales. In this sense their bond, however acquired, would constitute an investment for such legatees.

A few references to the testimony of Richard Stout show that he fully understood the situation, and the real object and intent of the contract. Thus he testified in answer to the question, " Did you not regard the estate of Gideon Wales as able to pay all its debts on the thirteenth of December, 1879? " A. " If forced to a settlement, not ; it was my judgment that as matters then looked, it was probable that a continuance of the business might result favorable to the estate. * * * I had a general knowledge of what they stated as their assets, of the valuation they put upon them ; some considerable degree of knowledge as to whether that valuation was just, from my acquaintance with other matters, and matters generally pertaining to tanning ; I had in my possession at that time, unless I am very much mistaken, an inventory that had been made

about the time of Gideon Wales' death. * * * Nearly all the Pike Pond property belonged to the estate of Gideon Wales; entirely so; it consisted of a tannery, and bark lands, and wild lands and a mill, dwelling houses, general tannery property. * * * I had come to the conclusion on the thirteenth of December, 1879, as to the solvency or insolvency of Gideon Wales' estate, that it would not be sufficient to pay the claims against it. * * * In round figures, the amount of the claims of our firm against the estate of Gideon Wales, on the thirteenth of December, 1879, was about $100,000; the other indebtedness of the estate of Gideon Wales, as I understood it, on the thirteenth of December, 1879, was almost nothing; substantially all that the estate of Gideon Wales owed on the thirteenth of December, 1879, it owed our firm. * * *

Q. Well, then, you understood, as you told me before, that in consequence of your claims against the estate, they could not use the property to raise money to pay this $4,000 ? A. Yes, sir. * * *

Q. Now, I ask you why that was made one of the conditions, if the property was entirely under your control, as you have stated you so understood it? A. Well, I did not understand that it was entirely under my control.

Q. You understood that it could not be diverted from your claims and disposed of, you say? A. Not by the executors; no * * * I understood that the executors could not dispose of this property as long as they held it as executors, except in settlement of debt; * * * I did not know how I was to form executors into a firm; * * * I did understand that if these executors became members of a private copartnership, they could with more freedom dispose of the property than they could as executors; * * * I had declined to go on in business, or do any business with these people, as executors.

The evidence further showed that the residuary legatees of Gideon Wales had between March 25, 1877, and March

4, 1879, upon the requirement of the Stouts, entered into and executed five several agreements of partnership between themselves to carry on the business of tanning leather, which agreements were caused to be prepared by the Stouts, and were, after execution, kept in their possession.

In April, 1880, the Stouts, in an action in the supreme court against Charlotte G. Wales, Reuben H. Wales, Blake G. Wales and Grace E. Wales, caused an attachment to be issued and levied upon the property at Pike Pond, formerly belonging to Gideon Wales, as the property of some or one of the defendants in that action. Prior to that time the Stouts had induced the firms, composed of the residuary legatees, to assume the indebtedness of the estate of Gideon Wales to them, and at that time supposed, by the agreement of December 13, 1879, and otherwise, that the property of the estate had become vested in the residuary legatees. In no other way can the levy of the attachment upon the property of the estate be accounted for.

In August, 1880, an agreement was executed between the Stouts, the executors of Gideon Wales, and the several firms composed of the residuary legatees, whereby the executors adjusted the claims of the Stouts against the estate of Gideon Wales at $75,000, and agreed to transfer to the Stouts, in satisfaction thereof, all the property formerly owned by Gideon Wales at Pike Pond, with some inconsiderable exceptions, valued at $50,000. The Stouts agreed to accept the same and discharge their claims against the estate. Each party also thereby agreed to discharge any liability which the plaintiff in this action should establish against them on account of his claim to one-tenth share in said estate, without recourse to or claim therefor against the other parties to the contract.

I have not thought it necessary to refer particularly to the business of tanning leather carried on at High Lake, Pa., by the executors, as it could not affect the bearing of

the argument, and would serve only to obscure the questions to be considered, and prolong the discussion.

The evidence quoted seems to me to show, that in the view of the defendants Stout, there were but two parties in interest to the negotiations resulting in the contract sued upon; that while the executors were necessary parties to any proceeding to settle the suit pending against them, they were so in form only as they represented the property which in reality was wholly claimed by the Stouts. The Stouts, although believing the one-tenth interest in the estate claimed by Henry and Charles Wales to be worthless, were still willing and desirous of compromising it at some sums, rather than have the property of the estate sold, its affair closed up, and the business of tanning leather terminated by the dissolution of the firms carrying it on. The plain motive of the Stouts, by the contract in question, was to secure the continuance of relations which were profitable to them, although it entailed the necessity of increasing their advances for the Wales' estate.

The general term based its conclusions wholly upon what it called documentary evidence. This consisted of the stipulation entered into between the attorneys of Henry and Charles Wales, on one side, and the executors on the other, to settle and adjust the litigations pending between them, and the judgment entered thereon. It must be observed in the first place that these documents did not purport to contain the contract between the Stouts and the plaintiff, and threw a reflected light only upon the contract sued upon. These documents were executed as the consideration from the plaintiff for the promise of the Stouts. The judgment was procured with a view of terminating the plaintiff's enterest in the estate, and vesting the residuary legatees with title to the property of the estate, subject only to the payment of its debts. The stipulation was substantially to the effect that the two actions of Henry and Charles Wales against the executors should be consolidated; that the sum

22

of $4,000 should be estimated as the amount represented by the one-tenth interest of Charles and Henry, under the will of Gideon Wales; that such sum should be invested with W. & R. Stout and Brother, and that they should execute a bond for the payment thereof to the executors, in accordance with the terms of the will of Gideon Wales. Judgment was entered upon this stipulation substantially in accord with its provisions. We think the word "invested" as used in this stipulation signified a sum of money or security, which represented the interest of the legatees, Henry and Charles Wales, in the estate and in that sense, however procured, could properly be called an investment. It was a very natural word to use to signify the relation which the sum represented by the bond bore to the legatees for whose benefit it was designed and it was straining its legitimate signification to say that it was intended to indicate the relations existing between the executors and the obligors in the proposed bond. The plaintiff here took no part in the contract between the executors and the Stouts which procured the inducement to the giving of the security, and the breach of that contract by the executors formed no excuse for a breach of the Stouts' obligation to the plaintiff. The meaning of the word investment as used in the judgment is somewhat equivocal, but interpreted in the light of the surrounding circumstances, all doubt as to its signification must be removed.

It is also claimed by the respondents that the contract is void under the statute, as being a promise to answer for the debt, default or miscarriage of another, and should have been in writing. We think the statute has no application to the case. There was no existing debt or obligation until it was created by the contract, and then it was to be a debt from the Stouts to the executors, for trust purposes. The newly created fund was to be invested in a bond, and this having been done by the consent of the legatees, the liability of the estate to them, whatever it may have been before, would

thereafter be discharged. If the bond proved uncollectible, the loss would be that of the legatees, and they could not thereafter resort to the estate for indemnity. The undertaking was clearly an original one, as it consisted of an agreement to create a fund for a fixed sum in the place of a contingent and uncertain claim, which might or might not result to the benefit of the legatees. The consideration for the promise moved directly from the plaintiff to the Stouts, and consisted in the waiver by him of his legal right to an accounting by the executors, his consent to the continuance of business by the executors, the employment of the property of the estate in business for the benefit of the Stouts, which would otherwise have been unlawful, and the removal of an obstacle to the appropriation by the Stouts of such property in the payment of their claims against the estate and the firms succeeding to it. This was a valuable and sufficient consideration within the authorities, and constituted the undertaking of the Stouts an original promise. Mallory *v.* Gillett, 21 N. Y. 412 ; Prime *v.* Koehler, 77 Id. 91.

We have considered other points made by the respondents, but are of the opinion that they furnish no valid grounds for supporting the decision of the general term.

The order for a new trial should, therefore, be reversed and judgment entered upon the report of the referee and affirmed, with costs.

All concur, except ANDREWS, J., not voting, and PECKHAM, J., not sitting.